**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**KELLISA JONES, INDIVIDUALLY AND ON**
**BEHALF OF ALL WRONGFUL DEATH**
**BENEFICIARIES OF KEITH COLE, DECEASED,**                     **PLAINTIFF**

**v.**                                    **CIVIL ACTION NO.: 3:24-cv-297-MPM-RP**

**TATE COUNTY, MISSISSIPPI, BEN BRYOK,**
**IN HIS OFFICIAL AND INDIVIDUAL**
**CAPACITIES; AND JOHN AND JANE DOES 1-**
**15, IN THEIR OFFICIAL AND INDIVIDUAL**
**CAPACITIES**                                           **DEFENDANTS**

# ORDER

This cause comes before the court on the motion of defendants Tate County, Mississippi and Deputy Ben Bryok, to dismiss this action pursuant to Fed. R. Civ. P. 12. Plaintiff Kellisa Jones, acting on behalf of the wrongful death beneficiaries of the decedent Keith Cole, has responded in opposition to the motion. This court concludes that this Rule 12 motion to dismiss should be converted to one seeking Rule 56 summary judgment, and, having done so, that motion for summary judgment will be granted.

This is a § 1983 action arising out of the fatal shooting of plaintiff's decedent Keith Cole by Deputy Ben Bryok on September 23, 2021. On that day, Cole fled on foot through a wooded area after Bryok had stopped his vehicle. The parties disagree regarding whether Bryok was aware of an outstanding warrant for Cole's arrest at the time he stopped him, but plaintiff does concede that the deputy was aware that "another deputy had a protection order to serve Cole." [Brief at 2]. Both the arrest warrant and protection order related to allegations that Cole had committed various acts of domestic violence against his ex-girlfriend Danielle Cook, and

1

plaintiff concedes that "prior to September 23, Bryok had responded to calls from a third party alleging that Cole raped and kidnapped her." [Brief at 1-2]. While conceding this fact, plaintiff insists that "Bryok knew of no warrants for Cole's arrest." [Brief at 1-2].

All parties agree that, at the time he made the stop, Bryok was unaware of the fact that Cole had actually murdered Cook days before. In his brief, defendant describes this murder as follows:

> Unknown to law enforcement officers until days later, Keith Cole had returned to Ms. Cook's residence after the September 10th kidnaping and violently murdered Danielle Cook several days prior to September 23, 2021. Law enforcement would later receive a call for a welfare check on Danielle Cook at approximately 5:00 p.m. on September 26, 2021. Upon responding, officers discovered the body of Ms. Cook in the living room of her home. Based on the condition of the body, it was clear that Ms. Cook had been deceased for an extended period of time.

[Brief at 3-4]. On September 23, 2021, Deputy Bryok was on patrol when he observed Cole's vehicle traveling east on Mississippi Highway 4 near Lyles Road in Tate County and initiated a stop in order to facilitate service of the aforementioned protection order. [Complaint at 3].

In response, Cole pulled his vehicle off the road on the wood line next to Mississippi Highway 4, exited the vehicle and began fleeing from Bryok on foot through the nearby woods. [*Id.*] Deputy Bryok gave chase on foot. The video evidence reveals that, at one point during the chase, Bryok ordered Cole to lie down, or else he would be shot. [Video 1 at :26]. As discussed below, the video and other evidence in this case strongly suggest that, in response, Cole fired two shots from a weapon of some sort, though it is unclear whether he was aiming at Bryok or firing warning shots. [Video 1 at :28]. The video evidence establishes that Bryok continued chasing Cole until he discovered him, apparently exhausted, kneeling or lying in a wooded area. [Video 2 at :04]. The footage reveals that, as Bryok approached to within arm's length of Cole with his gun pointed at him, the suspect stood up and made a movement in the direction of the deputy's

weapon. [Video 2 at :10]. Bryok responded with two shots at close range, which resulted in Cole's death. Plaintiff Jones, as Cole's daughter, filed the instant § 1983 action against Bryok and Tate County alleging that her father's death was the result of an excessive use of force. Both defendants have presently moved to dismiss this action, pursuant to Fed. R. Civ. P. 12.

While this court ultimately agrees with defendants regarding the substantive merits of this case, it is still given considerable pause by their request that it decide this case in the context of a Rule 12(c) motion to dismiss on the pleadings, while at the same time considering a wide array of evidence which Tate County attached to its answer to the complaint. The problem with defendants' request is that, in seeking Rule 12(c) dismissal, they make a much more aggressive use of extrinsic evidence than this court can recall seeing in a Rule 12 motion, so much so that it appears to be, for all practical purposes, a Rule 56 summary judgment motion. The most prominent evidence in this regard is the bodycam video of the shooting incident which gave rise to this lawsuit, but that is far from the only such evidence cited in defendants' motions. To the contrary, Deputy Bryok also cites a Mississippi Bureau of Investigation (MBI) report, [brief at 20, n. 5], as well as certain other evidence which Tate County attached to its answer, including a document detailing the decedent's extensive criminal history.

In light of the foregoing, this court must wonder how it would be deciding a motion to dismiss "on the pleadings" if it is to assess the reliability of a wide range of evidence. Moreover, on a basic fairness level, it strikes this court as quite problematic to take a plaintiff's complaint which lacks any exhibits and thereupon permit the defendants to pick and choose exactly which proof the court should consider in deciding the merits of the case. In so stating, this court recognizes that there is long-standing Fifth Circuit precedent holding that:

> If the Court considers the matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable

3

opportunity to present all material that is pertinent to the motion." Fed.R.Civ.P. 12(d). **However, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim."**

*Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000)(emphasis added). The rule stated by the Fifth Circuit in *Collins* strikes this court as being quite correct since, if a plaintiff makes reference in his complaint to documents which are "central to [his] claim" then it seems entirely fair to permit the defendant to utilize those documents in any Rule 12 motion to dismiss. In the court's view, it should not make any great difference whether the defendant has attached the documents in question to its answer or to its motion to dismiss since, in either event, it is attempting to raise evidence which it regards as helpful to its defense.

It seems abundantly clear that, in this case, defendant seeks to go far beyond the *Collins* rule, in a manner which, if this court were to permit it, would eviscerate the fairness protections in that rule. For example, in seeking dismissal, defendant relies upon the MBI report regarding the shooting in this case which defendant Tate County attached to its answer to the complaint. [Defendant's brief at 5, note 24, citing Docket entry 38-1]. It is quite unsurprising that plaintiff never cited that report in her complaint, since the investigating officer found, among other things, that "I have concluded with a high degree of certainty that Deputy Benjamin Bryok's 'use of deadly force' was in response to apparent and immediate threats of great bodily harm and/or death to him." [38-1 at 12].

Needless to say, the MBI report in this case is not "central to plaintiff's claims." In fact, it is highly damaging. That being the case, *Collins* would clearly prohibit this court from considering that report if it had been attached to defendants' motions to dismiss, and their entire argument for its admissibility arises from the fact that Tate County attached it to its answer, rather than a motion to dismiss. To this fact, this court must wonder: so what? An answer

4

submitted by a defendant is hardly an unimpeachable writ; to the contrary, it is a partisan document, the content of which is fully in the control of the defendant. That being the case, if defendants were permitted to bypass the *Collins* rule simply by attaching documents to their answer then they would render that rule a nullity. Moreover, permitting a defendant to dictate what limited selection of helpful facts the district court is able to consider in its ruling would strike this court as being the judicial equivalent of a "canned hunt" which hardly comports with basic considerations of fairness.

In justifying his actions in this regard, defendant writes that "[i]t is well-established that in reviewing a Rule 12 motion, a court may consider any exhibits attached to the complaint and answer." [Brief at 12]. In support of that assertion, defendant cites the decision of *Olivier v. City of Brandon, Mississippi*, No. 321CV00636HTWLGI, 2022 WL 15047414 (S.D. Miss. Sept. 23, 2022). Judge Wingate did, in fact, indicate in *Olivier* that, in ruling upon the Rule 12(c) motion to dismiss in that case, he should "compare the legal claims identified in Plaintiff's Complaint with the factual allegations offered in support, inclusive of any exhibits attached to the Complaint and Answer." *Olivier*, 2022 WL 15047414 at *8. Defendant fails to mention, however, that, on appeal, the Fifth Circuit held that while Judge Wingate had properly dismissed the case, his order had "refer[red] to matters beyond the pleadings" and the appellate court accordingly "construe[d] the court's decision as a grant of summary judgment." *Olivier v. City of Brandon, Mississippi*, No. 22-60566, 2023 WL 5500223, at *2 (5th Cir. Aug. 25, 2023). In light of this ruling, this court believes that *Olivier* constitutes adverse, not helpful, authority for defendant in this context.

This court notes that, in making his ruling, Judge Wingate cited the Fifth Circuit's statement in *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015) that:

> In considering a motion for judgment on the pleadings under Rule 12(c), the court is generally limited to the contents of the pleadings, including attachments thereto. The 'pleadings' include the complaint [and] answer to the complaint[.]"

*Bosarge*, 796 F.3d 435, 440 (5th Cir. 2015). This court acknowledges that, if these two sentences in *Bosarge* were considered in isolation, then they might well constitute helpful authority for defendant on this issue. It is clear, however, that these sentences should not be considered in isolation, since the Fifth Circuit made it clear a few sentences later that:

> We have held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac–Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004). Given the similarities in the analyses under Rule 12(c) and Rule 12(b)(6), we will apply the same rule to documents attached to the Defendants' motion for judgment on the pleadings. *See Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir. 2002).

*Bosarge*, 796 F.3d at 440. It is thus apparent that the Fifth Circuit in *Bosarge* ended up applying the fairness protections set forth in *Collins* and that it was not attempting to exempt any documents attached to the answer from the scope of that rule. This court notes parenthetically that, even if such had been the intent of the *Bosarge* panel, then it is well settled that one Fifth Circuit panel may not overrule the holdings of another, and the *Collins* rule was well-settled precedent at the time *Bosarge* was decided.

In light of the foregoing, this court concludes that it must convert defendants' Rule 12 motions to summary judgment motions, and it has given the parties the required ten-day notice of its intent to do so. *See Holguin v. U.S. Dep't. of Army*, 98 F.3d 1337, 1996 WL 556767, at *2 (5th Cir. 1996). In response to this order, both sides chose to stand by their original submissions, and neither of them have supplemented their original proof or briefs. Having thus concluded that it should address these issues in the context of a Rule 56 motion for summary judgment, this court now turns to the issue of whether there are genuine fact issues regarding whether a Fourth Amendment violation occurred in this case.

6

Assessing the reasonableness of a police officer's use of force involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985)). This balancing "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* This court must judge the reasonableness of an officer's conduct "objectively," that is, without reference to the subjective intent or motivation that underlies the officer's conduct. *Id.* at 397, 109 S. Ct. 1865. It must also look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S. Ct. 1865. In doing so, this court must also account for the difficult and often split-second decisions that police officers must make in carrying out their duties. *Id.* at 396–97, 109 S. Ct. 1865.

In applying the above Fourth Amendment principles, this court must also be cognizant of the fact that the U.S. Supreme Court has recognized that "objective unreasonableness is a question of law that can be resolved on summary judgment." *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015). This means that, in cases where the facts relating to the circumstances which confronted a particular police officer are clear, the issue of whether that officer acted in an objectively reasonable manner in response to these facts is a question of law for this court. That being the case, it would be improper for this court, in such a case, to leave

7

the question of objective reasonableness to a jury.[1]  On the other hand, this court must be cognizant of the U.S. Supreme Court's admonition that, even when considering a defendant's qualified immunity defense, it must still view "the evidence at summary judgment in the light most favorable to [the plaintiff] with respect to the central facts of this case." *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 1868 (2014).

With these standards in mind, this court will turn to its analysis of the summary judgment evidence in this case, and, in doing so, it finds Bryok's bodycam video of the shooting to be dispositive in his favor.  This court notes that defendant has submitted two separate bodycam videos in this case, with the first being a thirty-six (36) second video depicting Cole fleeing through a wooded area with Bryok in pursuit.  In this first video, Cole appears to be approximately thirty yards in front of Bryok, running first through a wooded area and then down a paved road.  This court notes that, at the start of the video, Bryok's gun is not drawn, but, twenty-six (26) seconds into the video, he yells at the suspect "get down, Keith, I'm fixing to shoot!" While the video evidence at this point is less than clear, Cole appears to respond by firing two shots in rapid succession, although it is not clear that these shots are aimed at Bryok. [Video 1 at 28]. Considering the video in the light most favorable to plaintiff, it appears arguable that Cole fired these shots into the woods as a warning to Bryok that he also had a gun and was prepared to use it.  This interpretation of the video is arguably supported by the fact that, immediately afterwards, Bryok drew his own weapon for the first time in the video but did not discharge it.

---

[1] This court notes parenthetically that the fact that the Supreme Court in *Mullenix* wrote that objective unreasonableness is a question of law that can be resolved "on summary judgment" and not "in a Rule 12 motion to dismiss" constitutes further reason for this court to convert the motion to dismiss in this case to a summary judgment motion.

In his reply brief, Bryok argues that the fact that "Cole had fired his weapon **twice** at Deputy Bryok is conclusively established by the dispatch log stating '2 SHOTS FIRED AT T19,' the body camera footage, and the findings of MBI." [Brief at 9]. This court agrees with defendant that the record, considered as a whole, provides quite strong evidence that Cole fired two shots while being pursued by Bryok. In so stating, this court notes that, the dispatch log aside, two of what clearly sound like gunshots are heard at :28 seconds of the first video, and afterwards, Cole is seen swinging his left arm while walking, but keeping his right arm in front of his body, as if he were holding something in his right hand. [Video 1 at :30 to :36]. It thus seems quite likely that Cole fired two shots, although it is unclear whether these shots were aimed at Bryok or were warning shots. Having said that, plaintiff notes that there are important weaknesses relating to defendant's assertion that Bryok fired two shots, including the fact that no weapon is clearly visible in the (rather poor quality) video and none was ever recovered by law enforcement afterwards. [Brief at 2, note 5]. In light of these facts, this court will assume for the purposes of this motion that these shots did not actually occur, even though, as discussed above, its viewing of the first video leads it to conclude that Cole very likely did, in fact, fire his gun twice.

Ultimately, however, this court concludes that the first video is merely cumulative evidence in favor of Bryok, since the second video, standing alone, establishes that he acted in an objectively reasonable manner in this case. This court notes that the first thirty seconds of the second video (including the video of the shooting) lack audio, since Bryok can be seen turning on the microphone on his bodycam at this point. It is unclear to this court why Bryok had his microphone turned off for the first part of the video, or why he turned his bodycam off completely soon after Cole (apparently) fired two shots. While this court believes that Bryok's

9

decision to do so is not necessarily sinister in nature, it does tend to support viewing the evidence in this case with some caution. Even doing so, however, this court concludes that the second video conclusively establishes how Bryok was approaching an apparently exhausted Cole either lying down or kneeling, partially obscured by vegetation in a wooded area. [Video 2 at 4]. At this point, Bryok is seen walking towards Cole with his service revolver drawn, and, as he gets to within several feet of him, Cole begins to stand up. [Video 2 at 9]. This court believes that a decision by a suspect to stand up while an officer is approaching him, gun drawn, to make an arrest is something which a reasonable officer would regard as threatening in nature. This is true even though, at this point in the video, Cole appears to have discarded any weapon of his own which he may have had.

Ten (10) seconds into the video, Cole makes the decision which ultimately cost him his life, namely by lunging towards Bryok's gun once he was in very close proximity to him. [*Id.*] Immediately thereafter, Cole is seen falling to this ground, obviously having been shot. [Video 2 at 12]. In his brief, Bryok includes a screenshot which, he argues, shows that Cole had actually managed to grab hold of his gun. [Brief at 9]. For its part, however, this court believes that the screenshot in question is too blurry to make a firm conclusion regarding whether Cole actually managed to grab hold of Bryok's gun, but it regards this issue as ultimately being immaterial. This court has included its own screenshot of this regrettably poor-quality video evidence below:

10



This court believes that the poor quality of this image illustrates that individual screenshots of the video are of limited utility, though footage showing the momentum of Cole's body is of much greater assistance in ascertaining the facts of this case. Once again, this court concludes that this video evidence clearly shows that Cole lunged in the direction of Bryok's gun immediately before being shot.

In the court's view, even assuming that Cole did not manage to actually grab hold of Bryok's gun, a reasonable officer in his position would conclude that a fleeing suspect who had stood up as an officer was approaching him with his gun drawn and who had lunged in the direction of the officer's gun as he approached to within arm's reach of him posed an imminent threat to his life, requiring the use of lethal force to protect himself. In arguing otherwise, plaintiff writes in her brief that "looking at the video footage taken from Bryok's bodycam, a jury could find that Cole only attempted to push Bryok away from him with his left elbow and that

11

Bryok shot Cole twice while also pushing Cole away." [Brief at 11]. For its part, however, this court believes that the video clearly shows that Cole lunged in the direction of Bryok's gun at very close range, [video 2 at 10], and, that being the case, a reasonable officer in Bryok's position simply didn't have time to decide what Cole's intent was in doing so.

For the record, this court believes that the positioning of Cole's body as he first lunged towards Bryok is most consistent with a suspect reaching with his hand for a gun, but it does not regard the video evidence as being sufficiently clear to make a conclusive finding in this regard. In any event, it should be emphasized that interpreting the video evidence in this regard requires split-second analysis of bodycam footage which is being paused and replayed, from the calm and safety of a judge's chambers. Deputy Bryok did not have this luxury, since he was confronted in real-time with an imminent threat to his life, at the hands of what was obviously a very desperate and dangerous man. Cole had no one to blame but himself for putting Bryok in this position, and, if he wished to ensure that he was not fired upon, he should not have stood up and lunged at very close range in the direction of a gun which was quite appropriately being pointed at him. Under these circumstances, this court does not believe that Bryok was legally required to "wait and see" what Cole's exact intentions were in lunging in the direction of his gun, since, once he managed to grab it, it may have already been too late to protect his life.

In her brief, plaintiff comes close to conceding that Bryok's first discharge of his firearm was appropriate, while arguing that the second shot he fired was clearly excessive. Specifically, plaintiff argues that "[e]ven if a jury found the first shot to be necessary, a jury could still determine that Bryok's sudden use of a second shot was excessive." [Brief at 11]. This court disagrees. In so stating, this court emphasizes once again that, while the video of the shooting lacks audio, it makes it clear that both shots were fired during the very brief period when Cole

was still standing, lunging and posing an imminent threat to Bryok's life. Indeed, even without audio, there is simply no other point in the video in which the shots in question could have been fired. This court would further note that there is, in its view, a very good argument that Bryok would have acted in an objectively reasonable manner by firing at a suspect charging at him, even if that suspect had begun charging from a greater distance than that depicted in the video in this case. In so stating, this court observes that, once an officer has lawfully and appropriately drawn his weapon and is aiming it at a suspect, then it is quite difficult to discern any other reason for the suspect to charge at that officer than an attempt to grab that weapon and use it against the officer.[2] That being the case, it is not clear to this court that an officer would act in an objectively unreasonable manner by firing his weapon at a charging suspect who was still some distance from him. This court need not resolve these difficult issues here, since the video makes clear that, at the time Bryok fired his fatal shots, Cole had already reached him, or, at the very least, was extremely close to doing so.

Under these circumstances, this court concludes that Bryok's use of deadly force in this case was objectively reasonable, and it further believes that it was objectively reasonable for him to have determined that two shots were necessary to end the threat which he faced to his own life. In so stating, this court reiterates that, at the time Bryok fired two shots, Cole was already upon him and presented an imminent threat to grab the deputy's gun and use it against him. It at least seems arguable that, if Cole had begun charging at Bryok from a considerable distance, then he would have been better advised to aim for one incapacitating shot and then assess its

---

[2] This court notes that one exception which does come to mind is the "suicide by cop" scenario, in which the officer has been notified beforehand that the suspect in question is merely emotionally troubled and wishes to end his life. This court will not address the legal implications of such a scenario, since it is clearly not present here.

13

impact in deciding whether to fire again. In this case, however, Bryok did not have the luxury of taking a "wait and see" approach in this regard, and this court believes that he acted reasonably in concluding that two shots at close range were required to end the threat to his life. This court therefore concludes that no genuine issue of fact exists regarding whether either of the shots fired by Bryok in this case represented an objectively unreasonable use of force within the meaning of the above-cited U.S. Supreme Court precedent.

This court notes that all of the claims in plaintiff's complaint involve allegations of excessive force, and, that being the case, this entire case is due to be dismissed in light of its finding that no Fourth Amendment violation took place in this case. [Complaint at 6-7]. Having said that, this court notes parenthetically that both Bryok and Tate County enjoy additional, and fully meritorious, defenses arising from the qualified immunity doctrine and the § 1983 defenses enjoyed by municipalities. This court finds defendants' briefing on these issues to be thorough and persuasive, but it will provide some brief observations of its own in this regard.

This court first considers Bryok's qualified immunity defense, as it relates to the claims asserted against him individually. This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, it must determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights. If the evidence viewed in the light most favorable to [the plaintiff] demonstrates that a constitutional violation occurred, this court must "next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007). Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden

14

of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir.1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is *not* entitled to qualified immunity).

Of course, this court has already concluded that there was no Fourth Amendment violation in this case, which means that plaintiff is unable to meet the first prong of the qualified immunity standard. Even assuming that this court has erred in so concluding, however, it would still conclude that plaintiff has failed to establish that Bryok violated "clearly established" federal law in this case. In arguing otherwise, plaintiff offers a factual scenario which is simply not present in this case, writing that:

> Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. *Tennessee. v. Garner*, 471 U.S. 1, 11 (1985). On September 23. 2021, it was clearly established law that when a suspect is incapacitated by being shot such that the suspect no longer posed a threat, firing additional shots would be an excessive application of force. *Mason v. Lafayette City-Par. Consol. Gov't,* 806 F.3d 268, 278 (5th Cir. 2015).

[Brief at 13]. This court notes that, in *Mason*, the Fifth Circuit based its holding upon a conclusion that a "reasonable jury could conclude that when [the officer] fired the final two shots, [the suspect] would have appeared incapacitated to an objectively reasonable officer." *Mason*, 806 F.3d at 278. While the result in *Mason* seems quite correct to this court, it notes that the facts of that case in no way resemble those here. In so stating, this court emphasizes that, in *Mason*, an officer fired five shots at a suspect, after which he was lying "in a prone position, face down" and the officer briefly stopped shooting. *Id.* at 273. The officer nevertheless fired two additional shots into the suspect's back, even though one witness testified (contrary to the officer's story) that she never saw the suspect "move his body, the trunk of his body." *Id.* at 274.

Needless to say, there is no comparison whatsoever between the facts here and those in *Mason*. Indeed, the fact that the Fifth Circuit in that case had no issue with the reasonableness of

the first five shots fired by the defendant officer, while the suspect was still standing, actually renders *Mason* helpful precedent for Bryok here. Once again, the video in this case makes it clear that Bryok fired two shots in rapid succession and that he did so at a time when Cole was still standing and posing a threat to him. This court therefore agrees with defendant that plaintiff is unable to meet the "clearly established" prong of the qualified immunity standard in this case, and this constitutes additional grounds for dismissing him from this case.

This court now turns to additional defenses enjoyed by Tate County, as to the claims asserted against it as a municipality. Of course, this court's conclusion that there was no Fourth Amendment violation by Bryok in this case serves as a complete defense to Tate County as well. The county correctly notes, however, that even if there had been a Fourth Amendment violation by Bryok in this case, plaintiff has failed to demonstrate that this violation was the result of a municipal "policy or custom" so as to give rise to municipal liability under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978). Under *Monell* and its progeny, a municipality may only be held liable under § 1983 for violating a citizen's constitutional rights if "the governmental body itself 'subjects' [that] person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359, 179 L.Ed.2d 417 (2011). Governmental entities are "responsible only for [their] own illegal acts" and are "not vicariously liable under § 1983 for [their] employees' actions." *Id.* Thus, there is no respondeat superior liability under § 1983; rather, the key to municipal liability is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom of the municipality in question. *Monell*, 436 U.S. at 694.

16

In her brief, plaintiff all but concedes that she is unable to establish municipal liability under *Monell*, arguing instead that this court should permit discovery on this issue in anticipation of a possible amendment of her complaint. Specifically, plaintiff writes that:

> In her Complaint, Plaintiff concedes to naming only Tate County, but also listed John Does 1-15 in their official and individual capacities. Similar to the discussion above, additional discovery would allow Plaintiff to identify any additional defendants, including relevant policy-makers, before attempting to amend her complaint.

[Brief at 9].

While this court is generally receptive to requests by plaintiffs to amend their complaints or to conduct discovery, it seems clear that both would be futile in this case. This is because this case arises out of the split-second decisions made by a low-level officer while confronting a suspect deep in the woods. That being the case, it is simply not plausible to believe that discovery might reveal that a municipal policymaker, such as the Sheriff, had any role in the events of this case so as to subject Tate County to potential liability. Moreover, while plaintiff pays lip service to a potential claim for failure to properly train Deputy Bryok, U.S. Supreme Court precedent makes it clear that failure to train claims represent one of the most difficult routes for bypassing *Monell*'s "custom or policy" requirement. In this vein, the Supreme Court made it clear in a 2011 decision that:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See *Oklahoma City v. Tuttle,* 471 U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* "). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton,* 489 U.S., at 388, 109 S.Ct. 1197. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.,* at 389, 109 S.Ct. 1197.

17

*Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359–60 (2011). In her briefing, plaintiff offers this court no reason to believe that this might be the rare case in which proof of failure to train Bryok allows her to bypass *Monell*'s bar, and this constitutes an additional, cumulative basis for dismissing the county from this case.

While this court believes that the above-stated findings are sufficient to dismiss both defendants from this lawsuit, it will briefly address certain additional issues raised by the parties. This court notes that, in her briefing, plaintiff appears to take issue with Bryok's decision to stop Cole's vehicle, [brief at footnote 2] but, since her complaint asserts no false arrest or unlawful stop claim, it will make no extensive inquiry into this issue. This court briefly notes its agreement with defendants, however, that, even assuming that Bryok was only aware that a protective order needed to be served upon Cole, that alone constitutes sufficient reason to stop his vehicle. Plaintiff offers this court no authority suggesting otherwise. This court does agree with plaintiff that, since it is clear that Bryok had no knowledge that Cole had killed his ex-girlfriend at the time he stopped him, it would be improper to consider that murder in evaluating the deputy's actions in this case. As is clear from this court's analysis of the Fourth Amendment issues above, it has not done so. This court has likewise not placed any weight upon the exonerating report prepared by the MBI in this case, even though it agrees with its conclusion that Bryok acted lawfully in this case.

As a final point, this court notes that it has chosen to consider the merits of this case even though it has some doubts whether plaintiff complied with all the procedural pre-requisites for filing a wrongful death claim under Mississippi law. [*See* Bryok's brief at 16-17]. At the same time, plaintiff notes that she was adjudicated as Cole's daughter in 1994, and, that being the case, it seems likely that she has standing, in a constitutional and jurisdictional sense, to assert at least

18

some claims in this case arising out of the death of her father. That being the case, if this court had concluded that plaintiff's claims had potential merit, then it would have likely stayed this case so that plaintiff could comply with all the procedural pre-requisites for filing a wrongful death claim under Mississippi law. As it happens, this court has concluded that plaintiff's claims lack any potential merit, and this case is therefore due to be dismissed on its merits.

In light of the foregoing, this court concludes that defendants' motions to dismiss should be converted to ones seeking summary judgment and that these motions should be granted.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

This, the 16th day of July, 2025.


  /s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI

19